Hernando WILLIAMS, Petitioner–Appellant,

v.

James CHRANS and Neil F. Hartigan, Respondents–Appellees.

No. 90–2707.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 17, 1991.

Decided Oct. 1, 1991.

Barry Levenstam (argued), Michael T. Brody, Jerold S. Solovy, Jenner & Block, Chicago, Ill., Donald B. Verrilli, Jr., Jenner & Block, Washington, D.C., for petitioner-appellant.

Marie Czech, Asst. Atty. Gen. (argued), Terence M. Madsen, Asst. Atty. Gen., Steven J. Zick, Crim. Appeals Div., Kathleen F. Howlett, Cook County State's Atty's. Office, Chicago, Ill., for respondents-appellees.

Before CUDAHY, RIPPLE and MANION, Circuit Judges.

RIPPLE, Circuit Judge.

Hernando Williams pled guilty to state charges of armed robbery, aggravated kidnapping, rape, and murder. A jury sentenced Mr. Williams to death. The conviction and sentence were affirmed on direct appeal to the Illinois state courts. A petition for collateral review likewise resulted in no relief. Mr. Williams then petitioned the district court for habeas relief under 28 U.S.C. § 2254. The district court denied his petition, 742 F.Supp. 472. Mr. Williams appealed. For the following reasons, we affirm the judgment of the district court.

## I

### BACKGROUND

#### A. *Facts*

In denying the petition for a writ of habeas corpus, the district court relied on the account of the underlying facts[1] set forth by the Illinois Supreme Court in Mr. Williams' direct appeal of his conviction.[2] We shall do the same. *See Sumner v. Mata*, 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981).

[T]he victim, Mrs. Linda Goldstone, on March 30, 1978, was employed at Northwestern Memorial Hospital in Chicago as an instructor in the Lamaze method of childbirth. On that evening, as she was alighting from her car in the victinity [sic] of the hospital, she was approached by the defendant and robbed at gunpoint. He made her undress from the waist down. He then forced her into his car and, it appears, took her to a shop owned by his father. There he bound her hands and feet.

He then forced her into the trunk of his car. With Mrs. Goldstone in the trunk, the defendant picked up his sister at work and drove her home. He then drove the victim to a motel, forced her inside and raped her.

---

1. As the district court noted, during police interrogation, Mr. Williams initially denied having committed the crimes, but after the police told Mr. Williams that his story did not check out, he gave a detailed confession. The statement of facts is based on that confession as corroborated at the capital sentencing hearing by evidence and testimony.

2. *See People v. Williams*, 97 Ill.2d 252, 73 Ill. Dec. 360, 364–65, 454 N.E.2d 220, 224–25 (1983), *cert. denied*, 466 U.S. 981, 104 S.Ct. 2364, 80 L.Ed.2d 836 (1984).

On the next day, with Mrs. Goldstone bound and locked in the trunk of the car, the defendant appeared at a suburban court where charges of aggravated kidnaping, rape and armed robbery were pending against him. The case was continued, and the defendant then drove to visit a friend, Nettie Jones, at her apartment. While he was there, people of the area heard cries for help coming from the trunk of his auto. Someone notified the police of the incident. The defendant drove away from a crowd that had gathered and proceeded to a tavern, where he visited other friends.

Early that evening, the defendant checked into another motel. He forced Mrs. Goldstone into the motel and again raped her. Later, he forced her back into the trunk and picked up his niece at a friend's house and drove the niece home. As he had done the day before, he drove his sister home from work and spent the evening visiting various taverns with friends.

In the meantime, police were searching for the defendant's car. The victim's husband, Dr. James Goldstone, a physician, after learning that his wife had not appeared for class that evening, notified the police of her absence. The victim's car was found by Northwestern University security officers. Early the following morning, Dr. Goldstone received a phone call from his wife in which she told him that she would be home soon. He heard a voice in the background say, "Shut up bitch, tell him you'll be home in about an hour." The victim asked Dr. Goldstone if he had called the police, and he told her to tell the man whose voice he had heard that he had not informed the police.

Officers investigating the incident at Jones' apartment obtained the license number of the car and learned that the defendant had visited Jones. The police searched the area for the auto without success and periodically watched the defendant's home, but the car was not located.

On April 1, at 6 a.m., the defendant released the victim from the trunk of the auto. He gave her $1.25 and instructed her to take a bus home and not to call the police. He then drove off. The victim, ignoring his instructions, ran to the porch of a nearby house for help. The person who came to the door refused to allow her to enter, but he did call the police. The defendant, who had only driven around the block to see whether his instructions would be obeyed, returned and ordered the victim off the porch. He then took her to an abandoned garage and killed her, shooting her in the chest and head. There was medical evidence that the victim had been beaten once or more during her captivity.

The defendant was arrested at his home that afternoon while he was washing the trunk of his car.

73 Ill.Dec. at 364–65, 454 N.E.2d at 224–25.

B. *Procedural History*

On April 1, 1978, Williams was arrested for the murder, aggravated kidnapping, rape, and armed robbery of Linda Goldstone. He first pled not guilty. After the state trial court denied several pretrial motions, including a motion to suppress the confession, Mr. Williams changed his plea to guilty to one count each of murder, aggravated kidnapping, rape, and armed robbery. The state then formally requested a capital sentencing hearing, and Mr. Williams submitted his jury request.

The Illinois death penalty statute[3] provides for a bifurcated sentencing hearing. In the first phase—the eligibility phase—the state must prove beyond a reasonable doubt at least one of seven aggravating factors. In the second phase—the aggravation/mitigation phase—the state presents evidence of any aggravating factors. The defense argues any mitigating factors.

In the first phase, the jury determined that the state had established beyond a reasonable doubt the existence of two statutory aggravating factors: Mr. Williams had murdered Linda Goldstone in the

3. Ill.Rev.Stat. ch. 38, § 9–1 (1977).

course of three other felonies and had murdered an eyewitness to the crimes. In the second phase, during which Mr. Williams testified on his own behalf, the jury unanimously found that there were no mitigating factors sufficient to preclude the imposition of the death sentence. The court therefore sentenced Mr. Williams to death.

As provided by Illinois law,[4] Mr. Williams then appealed directly to the Illinois Supreme Court. The conviction and sentence were affirmed. *See People v. Williams*, 97 Ill.2d 252, 73 Ill.Dec. 360, 454 N.E.2d 220 (1983), *cert. denied*, 466 U.S. 981, 104 S.Ct. 2364, 80 L.Ed.2d 836 (1984). A post-conviction petition was then filed in the Circuit Court of Cook County.[5] The trial court denied the petition without a hearing. The Illinois Supreme Court affirmed. *People v. Williams*, 109 Ill.2d 391, 94 Ill.Dec. 429, 488 N.E.2d 255 (1985), *cert. denied*, 478 U.S. 1022, 106 S.Ct. 3340, 92 L.Ed.2d 744 (1986). Mr. Williams then filed a petition for a writ of habeas corpus in the district court. After full briefing and argument, the district court, in a lengthy and comprehensive opinion, denied the petition. This appeal followed.

## II

## ANALYSIS

The people of Illinois, through their elected representatives, have decided that, under certain circumstances, the crime of murder ought to be punished by death. In this case, the state, acting through an elected prosecutor, asked that such a penalty be imposed. An Illinois jury agreed and the courts of Illinois have determined that the jury's decision is lawful as a matter of state law. The state courts also have determined that the imposition of death by the state in this case does not offend federal constitutional standards. It is, of course, only this last decision that is reviewable on petition for a writ of habeas corpus in the district court and, on appeal, in this court. With this perspective in

4. Ill.Rev.Stat. ch. 38, § 9–1(i) (1977).

5. Ill.Rev.Stat. ch. 38, § 122–1, *et seq.* (1983).

mind, we shall address each of Mr. Williams' contentions. In each instance, we set out, when appropriate, the analysis of the district court. We also note that we have had the benefit of excellent briefs and oral presentations by both counsel for the state and counsel for Mr. Williams, who, we gratefully note, served by appointment of the court.

### A. Coercion of Guilty Plea

We begin with the only matter raised by Mr. Williams that implicates directly the proceedings prior to the capital sentencing proceeding. The district court set forth the matter succinctly, and we rely heavily on its description of this submission by Mr. Williams.[6]

The Cook County Public Defender's Office assigned four attorneys to represent Mr. Williams. According to their affidavits, which the district court took as true for purposes of this claim, they initially agreed that Mr. Williams should continue to plead not guilty and proceed to trial. A psychologist and psychiatrist were hired to assist in jury selection, to assess Mr. Williams' competency to stand trial, and to advise on the merits of an insanity defense. The trial court denied key defense motions, including the motion to suppress the confession. Defense counsel then determined that the chance of acquittal was slim and that Mr. Williams would best be served by a guilty plea and a strong defense at the capital sentencing hearing. They accordingly persuaded Mr. Williams to enter a guilty plea. In his affidavit, Mr. Williams describes the day before trial:

> [One of my attorneys] came to visit me. He continued to press me to enter a guilty plea. I did not want to do that. He repeatedly told me that I was hurting my family by holding out, that the only way to spare them was to plead and that I would die if I did not plead. Finally, against my will, I agreed to enter a guilty plea.

6. *See* 742 F.Supp. at 478.

R.80 Ex. A at 4–5. One of the attorneys describes their methods of persuasion:

> As a response to our client's position, the four of us as well as [the psychologist] attempted to pursuade [sic] the defendant that a plea of not guilty would be a mistake. These conversations were not discussions of trial strategy, nor were they reminiscent of the numerous occasions in which I pursuaded [sic] a client to plead guilty to accept the plea bargain being offered by the State. In this case the psychological pressure and the sophisticated tactics used with Hernando Williams to convince him to adopt our approach were unlike any other conversations I ever had with any other client. Also, it goes without saying, that in this case there were no plea bargaining offers from the State.
>
> All of the psychiatric and psychological information which had been gathered and developed by [the doctors] was used by me and my associates to compel Mr. Williams to accept our point of view. This constituted a unique form of coercion. We took advantage of our client, maximizing the use of the information we had gathered for a purpose other than which it was intended. Our strategy was developed to accommodate us and not our client. There is no question that during this period (which lasted over a year) we did not act in accordance with our client's wishes. Rather, we used every means available to force him to change his plea.
>
> Mr. Williams ultimately gave in to this extreme pressure shortly before the trial was to begin.

R.80 Ex. B at 2.

Mr. Williams argued in the state courts that he entered the plea unintelligently because he was unaware that the death penalty was an option after a guilty plea. The Illinois Supreme Court denied the claim. It noted that the trial court told Mr. Williams numerous times that he could be subject to the death penalty, and there was no evidence that he was informed otherwise.[7]

[7]. *See* 73 Ill.Dec. at 367–68, 454 N.E.2d at 227–28.

In his petition for habeas corpus, Mr. Williams now argues that his plea was coerced. The state replies to this claim by contending, as it did in the district court, that the issue was waived by the failure of Mr. Williams to argue the matter in the state proceedings. Mr. Williams' claim that his guilty plea was coerced "was not presented, and these affidavits were not tendered, in petitioner's post-trial motion to vacate his pleas, brief on direct appeal, or petition for post-conviction relief. Indeed, this claim was first raised by way of amendment a year after the filing of the original habeas corpus petition. Alternatively stated, counsel first claimed coercion in 1988, ten years after petitioner pleaded guilty in 1978." Appellees' Br. at 40.

■ As the district court noted, a federal habeas petitioner usually forfeits the right to challenge a conviction or sentence on grounds not raised in the state courts. We excuse the forfeiture of such a claim only if the petitioner can show cause and prejudice. *See Coleman v. Thompson*, —— U.S. ——, 111 S.Ct. 2546, 2565, 115 L.Ed.2d 640 (1991); *Wainwright v. Sykes*, 433 U.S. 72, 87, 97 S.Ct. 2497, 2506, 53 L.Ed.2d 594 (1977); *Morrison v. Duckworth*, 898 F.2d 1298, 1300 (7th Cir.1990).

■ Mr. Williams' counsel during state collateral proceedings was not the same counsel who had represented him when he pled guilty at trial. Mr. Williams seeks to rely on his counsels' incompetence to excuse his failure to challenge in the state courts his allegedly coerced guilty plea. Ineffective assistance of counsel "supplies 'cause' only when the Constitution requires the state to assure adequate legal assistance." *See Coleman*, 111 S.Ct. at 2566; *see also Prihoda v. McCaughtry*, 910 F.2d 1379, 1386 (7th Cir.1990); *Morrison*, 898 F.2d at 1300–01. There is no constitutional right to the assistance of counsel in a state collateral proceeding. *Pennsylvania v. Finley*, 481 U.S. 551, 555, 107 S.Ct. 1990, 1993, 95 L.Ed.2d 539 (1987). Therefore, any ineffective assistance by Mr. Williams' counsel does not provide cause to excuse

Mr. Williams' procedural default. *See Coleman,* 111 S.Ct. at 2568.[8]

█ More fundamentally, Mr. Williams has not demonstrated that he was prejudiced by his counsels' failure to challenge the voluntariness of his guilty plea. The test for determining the validity of a guilty plea is "whether the plea represents a voluntary and intelligent choice among alternative courses of action open to the defendant." *North Carolina v. Alford,* 400 U.S. 25, 31, 91 S.Ct. 160, 164, 27 L.Ed.2d 162 (1970). "Simply because the [defendant] was subjected to pressure from sources not associated with the state or prosecutors does not mean that [the defendant's] guilty plea was necessarily involuntary. It is not an uncommon occurrence that a criminal defendant is pressured to some extent by co-defendants, friends, and relatives. These types of influences are inevitable and unavoidable." *Lo Conte v. Dugger,* 847 F.2d 745, 753 (11th Cir.), *cert. denied,* 488 U.S. 958, 109 S.Ct. 397, 102 L.Ed.2d 386 (1988). In this case, Mr. Williams' attorneys concluded that a guilty plea was in his best interests and used verbal persuasion to convince their client to plead guilty.

The attorneys concluded on the merits and in their best judgment that a guilty plea was in Williams' best interest. There is no reason to question that conclusion. Williams' detailed confession survived the motion to suppress and a conviction seemed inevitable. The attorneys did not promise Williams that a guilty plea would spare him the death penalty.... The attorneys never threatened Williams or his family.

742 F.Supp. at 480. "Advice—even strong urging" by counsel does not invalidate a guilty plea. *Lunz v. Henderson,* 533 F.2d 1322, 1327 (2d Cir.), *cert. denied,* 429 U.S. 849, 97 S.Ct. 136, 50 L.Ed.2d 122 (1976).[9] Thus, we agree with the district court's conclusion that Mr. Williams' claim of coercion lacks merit. This conclusion is buttressed by Mr. Williams' statements in open court that "his plea was voluntary and not the product of any threats or promises from the prosecution, his attorneys or prison officials." 742 F.Supp. at 480. The trial court asked Mr. Williams no less than three times whether his guilty plea was voluntary. Each response indicated that his plea was voluntary. *See* Tr. Vol. 3 at 15–16.[10]

### B. *Constitutionality of the Illinois Death Penalty Statute*

We now turn to the penalty phase of the state proceeding. Mr. Williams submits that the part of the Illinois statute detailing the procedure for determining whether the death penalty ought to be imposed is constitutionally infirm. He sets forth several arguments that, in his view, are not precluded by this court's earlier decisions. He also asks this court to consider several additional issues which, while admittedly precluded by this circuit's current case law, require, he contends, reappraisal. The state submits that all of Mr. William's contentions are precluded by this court's deci-

---

**8.** Mr. Williams does not argue that federal review of his claim is necessary to prevent a fundamental miscarriage of justice. *See Coleman,* 111 S.Ct. at 2568; *Murray v. Carrier,* 477 U.S. 478, 496, 106 S.Ct. 2639, 2649, 91 L.Ed.2d 397 (1986). In any event, as we note in the following text, Mr. Williams has failed to establish that he was prejudiced by his attorneys' failure not to press his argument that his guilty plea was coerced.

**9.** *See also Uresti v. Lynaugh,* 821 F.2d 1099 (5th Cir.1987) (attorney's threat to withdraw from case if defendant did not accept plea bargain was insufficient to establish that plea was involuntary); *cf. Caudill v. Jago,* 747 F.2d 1046 (6th Cir.1984) (guilty plea not involuntary where trial judge told defendant on day before trial that court would have no hesitation in imposing

death penalty if defendant found guilty and no mitigating circumstances were shown).

**10.** We also note that we would be most reluctant to fashion a rule that would permit a defendant to invalidate a guilty plea simply by producing an affidavit from his attorney indicating that the attorney used verbal persuasion to induce the plea. Such a rule could provide attorneys with incentives to disregard (or later claim to have disregarded) their responsibilities, especially in cases involving capital punishment. *See Brewer v. Aiken,* 935 F.2d 850, 860–61 (1991) (Easterbrook, J., concurring) ("some lawyers are willing to break rules to prevent capital punishment, which they view as a sin greater than any they could commit in the client's behalf").

sion in *Silagy v. Peters*, 905 F.2d 986 (7th Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 1024, 112 L.Ed.2d 1106 (1991).

The Illinois death penalty statute was described succinctly by our colleague in the district court.[11] We rely heavily on that concise description in the following paraphrase. Under the Illinois death penalty statute, the prosecution may request a capital sentencing hearing after the defendant pleads guilty to or is convicted of murder. Ill.Rev.Stat. ch. 38, ¶ 9–1. The hearing is conducted in two phases. In the first phase, the state must prove beyond a reasonable doubt that the defendant is eligible for the death penalty: that the defendant was at least eighteen years of age at the time of the offense and that one or more of seven aggravating factors exist.[12] Both the state and the defendant must comply with the criminal rules of evidence in this eligibility phase. If the jury [13] unanimously finds that the state has met its burden of establishing that the defendant is eligible for the death penalty, the second phase commences. At this stage, the state presents evidence of any aggravating factors, statutory or otherwise, and the defense presents mitigating circumstances. The statute lists five potentially relevant mitigating factors, but only by way of example.[14] The defendant may present any

---

**11.** *See* 742 F.Supp. at 497–98.

**12.** (b) **Aggravating Factors.** A defendant who at the time of the commission of the offense has attained the age of 18 or more and who has been found guilty of murder may be sentenced to death if:

1. the murdered individual was a peace officer or fireman killed in the course of performing his official duties and the defendant knew or should have known that the murdered individual was a peace officer or fireman; or

2. the murdered individual was an employee of an institution or facility of the Department of Corrections, or any similar local correctional agency, killed in the course of performing his official duties, or the murdered individual was an inmate at such institution or facility and was killed on the grounds thereof, or the murdered individual was otherwise present in such institution or facility with the knowledge and approval of the chief administrative officer thereof; or

3. the defendant has been convicted of murdering two or more individuals under subsection (a) of this Section or under any law of the United States or of any state which is substantially similar to Subsection (a) of this Section regardless of whether the deaths occurred as the result of the same act or of several related or unrelated acts so long as the deaths were the result of either an intent to kill more than one person or of separate premeditated acts; or

4. the murdered individual was killed as a result of the hijacking of an airplane, train, ship, bus or other public conveyance; or

5. the defendant committed the murder pursuant to a contract, agreement or understanding by which he was to receive money or anything of value in return for committing the murder or procured another to commit the murder for money or anything of value; or

6. the murdered individual was killed in the course of another felony if:

(a) the murdered individual was actually killed by the defendant and not by another party to the crime or simply as a consequence of the crime; and

(b) the defendant killed the murdered individual intentionally or with the knowledge that the acts which caused the death created a strong probability of death or great bodily harm to the murdered individual or another; and

(c) the other felony was one of the following: armed robbery, robbery, rape, deviate sexual assault, aggravated kidnapping, forcible detention, arson, burglary, or the taking of indecent liberties with a child;

7. the murdered individual was a witness in a prosecution against the defendant, gave material assistance to the state in any investigation or prosecution of the defendant, or was an eye witness or possessed other material evidence against the defendant.

**13.** The statute also provides that the defendant may waive a jury trial in the capital sentencing hearing and proceed before a judge. Mr. Williams opted for a jury trial, and we accordingly describe and assess the death penalty in that context.

**14.** The statute provides that

Mitigating factors may include but need not be limited to the following:

1. the defendant has no significant history of prior criminal activity;

2. the murder was committed while the defendant was under the influence of extreme mental or emotional disturbance, although not such as to constitute a defense to prosecution;

3. the murdered individual was a participant in the defendant's homicidal conduct or consented to the homicidal act;

4. the defendant acted under the compulsion of threat or menace of the imminent infliction of death or great bodily harm;

aspects of the defendant's character or record, and any of the circumstances of the offense that militate against the imposition of the death sentence. The criminal rules of evidence are relaxed in this phase. The following statutory language provides the standard by which the jury is to assess the mitigating and aggravating factors:

> If the jury determines unanimously that there are no mitigating factors sufficient to preclude the imposition of the death sentence, the court shall sentence the defendant to death.

> Unless the jury unanimously finds that there are no mitigating factors sufficient to preclude the imposition of the death sentence the court shall sentence the defendant to a term of imprisonment under Chapter V of the Unified Code of Corrections.[15]

Ill.Rev.Stat. ch. 38, ¶ 9–1(g). The jury evaluates the factors presented and argued by the parties and the death sentence is imposed only if all jurors agree that the mitigating factors are insufficient to preclude a death sentence. If the jurors unanimously agree that no such mitigating factors exist, then the court must impose a death sentence. However, a juror may find a mitigating factor even if the defendant presents no evidence at the sentencing hearing. *See* 742 F.Supp. at 497.

Mr. Williams raises a number of constitutional challenges to the Illinois death penalty statute that, he submits, are not precluded by the court's earlier decision in *Silagy*. First, Mr. Williams argues that the statute does not permit an individualized determination of the appropriateness of a death sentence. Second, he argues that the statute places an impermissible burden of persuasion on capital defendants. Third, Mr. Williams contends that the statute is un-

constitutionally vague. We shall review each.

### 1. *Individual sentencing determination*

■ Mr. Williams' initial constitutional argument is that the Illinois death penalty statute improperly requires the defendant's mitigating evidence "to preclude" the death penalty, and thus removes from a sentencing jury the discretion to determine in each individual case whether the aggravating and mitigating evidence supports the imposition of a death sentence. *See* Ill.Rev. Stat. ch. 38, ¶ 9–1(g). "Because of the word 'preclude,' this language does not direct a sentencing jury to weigh the evidence. The statute does not permit the jury to sentence the defendant to a punishment less than death if mitigating evidence narrowly outweighs aggravating evidence." Petitioner's Br. at 52.

In *Silagy v. Peters*, the court rejected the argument that section 9–1(g) prevents the sentencer from basing its sentencing determination on the individual characteristics of the defendant and the unique circumstances of the crime. The court relied upon the Supreme Court's decision in *Blystone v. Pennsylvania*, 494 U.S. 299, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990). In *Blystone*, the Supreme Court reviewed the Pennsylvania death penalty statute, which permitted the death penalty "if the jury unanimously finds one or more aggravating circumstances *which outweigh* any mitigating circumstances." *Id.* 110 S.Ct. at 1081 (emphasis added). In upholding the Pennsylvania statute, the Supreme Court wrote that "[d]eath is not automatically imposed upon conviction for certain types of murder. It is imposed only after a de-

---

5. the defendant was not personally present during the commission of the act or acts causing death.

Ill.Rev.Stat. ch. 38, ¶ 9–1(c).

15. The court in Mr. Williams' sentencing hearing gave the following instructions to the jury which substantially traced this statutory language:

> If, after your deliberations, you unanimously determine that there are not sufficiently mitigating factor or factors to preclude the impo-

sition of the death sentence on the defendant, you should sign the verdict form which so indicates. If you sign that verdict form, the Court must sentence the defendant to death. If, after your deliberations, you cannot unanimously conclude that there are no sufficiently mitigating factor or factors to preclude the imposition of the death sentence, you should sign the form which so indicates. If you sign that verdict form, the Court will sentence the defendant to imprisonment.

termination that the aggravating circumstances outweigh the mitigating circumstances in the particular crime committed by the particular defendant." *Blystone*, 110 S.Ct. at 1082.

Mr. Williams endeavors to distinguish *Blystone* by highlighting the different wording of the Pennsylvania statute (requiring aggravating factors to *"outweigh"* mitigating factors) and the Illinois statute (requiring mitigating factors *"sufficient to preclude"* the death penalty). Having thus attempted to distinguish *Blystone*, which served as the foundation of the court's decision in *Silagy*, Mr. Williams asserts that *Silagy* does not govern his case.

We cannot accept Mr. Williams' contention that this issue is not controlled by *Silagy*. While two judges, both members of the present panel, believed the issue worthy of review by the entire court,[16] that view did not prevail and the doctrines of stare decisis and precedent require this panel's adherence to *Silagy*. The *Silagy* court found no difference between the operative parts of the Illinois and Pennsylvania death statutes: "As in Pennsylvania, a sentence of death is imposed in Illinois only after the sentencing authority determines that the aggravating circumstances outweigh the mitigating circumstances in the particular crime committed by the particular defendant." *Silagy*, 905 F.2d at 1000. Because this court already has determined that no meaningful difference exists between the Illinois and the Pennsylvania statutes on this issue, we cannot accept Mr. Williams' argument that the Illinois statute fails to require the sentencer to base its determination on the individual characteristics of the defendant and the unique circumstances of the crime.

### 2. *Burden of persuasion*

■ Mr. Williams' second argument is that the Illinois statute places an impermissible burden of persuasion on capital defendants. Under Mr. Williams' view of the statute, because mitigating factors must be "sufficient to preclude" the imposition of the death penalty, the defendant carries the burden of proving beyond a reasonable doubt that death is the wrong sentence. Appellant's Br. at 56.

The petitioner in *Silagy* argued that the statute created a mandatory rebuttable presumption in favor of the death penalty, thus impermissibly shifting the burden of persuasion to the defendant to show that the death penalty is inappropriate in his case. The *Silagy* court, however, found that this language did not place an unconstitutional burden on defendants. "Section 9–1(g), simply provides a balance upon which the sentencing authority can place the various mitigating and aggravating circumstances to determine whether the imposition of the death penalty is appropriate in a particular case." 905 F.2d at 998. The court agreed with the Illinois Supreme Court that the State " 'bears the primary burden of persuading the jury that, as the statute states, there are no mitigating factors sufficient to preclude the sentencer from imposing the sentence of death for which the defendant is eligible.' " *Id.* (quoting *People v. Bean*, 137 Ill.2d 65, 147 Ill.Dec. 891, 925, 560 N.E.2d 258, 292 (1990)). After the state has attempted to persuade the jury that the death penalty should be imposed, the defendant then may attempt to dissuade the jury from imposing the death penalty. If the defendant attempts to dissuade the jury from imposing the death penalty, the statute imposes a burden of persuasion on him. "[T]he imposition of such a burden of persuasion on a defendant 'is constitutional because at this point in the hearing the prosecution has already proven beyond a reasonable doubt that a statutory aggravating factor exists making the defendant eligible for the death penalty, and the jury is now weighing aggravating and mitigating factors presented by both the State and the defendant.' " *Id.* (quoting *Bean*, 147 Ill.Dec. at 925, 560 N.E.2d at 292) (citation omitted). The court relied in part on *Walton v. Arizona*, — U.S. —, 110 S.Ct. 3047, 111 L.Ed.2d

---

**16.** See *Silagy v. Peters*, 905 F.2d 986, 1013, 1014 (1990) (Cudahy, J., dissenting from denial of rehearing en banc); *id.* at 1014 (Ripple, J.)

(same), *cert. denied*, — U.S. —, 111 S.Ct. 1024, 112 L.Ed.2d 1106 (1991).

511 (1990), which involved the review of a non-jury trial. " 'So long as a State's method of allocating the burdens of proof does not lessen the State's burden to prove every element of the offense charged, or in this case to prove the existence of aggravating circumstances, a defendant's constitutional rights are not violated by placing on him the burden of proving mitigating circumstances sufficiently substantial to call for leniency.' " *Silagy*, 905 F.2d at 999 (quoting *Walton*, 110 S.Ct. at 3055). Accordingly, we believe that the doctrines of stare decisis and precedent require this panel's adherence to the holding of *Silagy*.[17]

### 3. *Vagueness*

Mr. Williams' third attack on the constitutionality of the Illinois death penalty statute is that it is impermissibly vague. Mr. Williams suggests that the statute is vague in three respects: a) the burden of persuasion placed on defendants during the aggravation/mitigation phase; b) the "sufficient to preclude" language in the statute itself; and c) the jury instruction based upon the statute to the effect that the jury should return a verdict against the death penalty if the jury "cannot unanimously conclude that there are no sufficiently mitigating factor or factors to preclude the imposition of the death penalty." Tr. 5493.

### a. burden of persuasion

■ This court stated in *Silagy* that the burden of persuasion provision "in a constitutional way guides the jury (or judge) in determining under what circumstances the death penalty should be imposed." 905 F.2d at 998. Because the statute provides "for a certain result based on the balance struck by the jury between the aggravating and mitigating circumstances," the court found that the statute did not impose the death penalty in an arbitrary or capricious manner. *Id.* In short, this court already has determined that the statute is not vague with regard to the burden of persuasion at the sentencing hearing.

### b. "sufficient to preclude"

■ Mr. Williams' second argument is that the phrase "sufficient to preclude" does not adequately guide the jury. The district court stated that "[t]he isolated phrase 'sufficient to preclude the imposition of the death sentence' is not vague. It directs the jurors to consider all of the factors presented and to give each factor whatever weight they deem appropriate. The Eighth Amendment insists rather than frowns on that kind of discretion." 742 F.Supp. at 501. We believe that this court at least implicitly rejected this argument in *Silagy* when the court stated that section 9–1(g) "in a constitutional way guides the jury (or judge) in determining under what circumstances the death penalty should be imposed." 905 F.2d at 998.

### c. jury instructions

■ Mr. Williams also challenges the jury instruction used in his case, contending that it prevented the jury from making an intelligent decision. The jury was instructed that:

If, after your deliberations, you unanimously determine that there are no sufficiently mitigating factor or factors to preclude the imposition of the death sentence on the defendant, you should sign the verdict form which so indicates.

If, after your deliberations, you cannot unanimously conclude that there are no sufficiently mitigating factor or factors to preclude the imposition of the death sentence, you should sign the form which so indicates.

Tr. 5493. The jury later was instructed that:

If after your deliberations one or more jurors conclude that the defendant should not be sentenced to death, all jurors shall sign the verdict reflecting the jury's inability to reach a unanimous verdict.

If after your deliberations you unanimously conclude that the defendant should be sentenced to death, all jurors shall sign the verdict reflecting the jury's

---

**17.** *See* footnote 11, *supra,* and accompanying text.

unanimous conclusion that the court shall sentence the defendant to death. Tr. 5495.

The Supreme Court recently has refined the proper standard by which to evaluate vagueness challenges to jury instructions. "We think the proper inquiry in such a case is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California,* 494 U.S. 370, 110 S.Ct. 1190, 1198, 108 L.Ed.2d 316 (1990). The Supreme Court also stated that

> [j]urors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting.

*Id.* After reading the instructions as a whole, we are convinced that the jury was adequately guided by the instructions and that the jury was not prevented from considering all constitutionally relevant evidence. In our view, the instructions, read as a whole, directed the jury to balance aggravating and mitigating factors and to impose the death sentence only if all members of the jury concluded that aggravating factors outweighed mitigating factors. Therefore, the Illinois statute is not unconstitutionally vague.

### 4. *Other challenges*

Mr. Williams requests this court to reconsider several rulings admittedly controlled by its prior rulings.

### a. prosecutorial discretion

■ In *Silagy,* the petitioner argued that the prosecutor's unfettered discretion un-

der § 9–1(d) of the statute in deciding whether to seek the death penalty in a particular case violates the eighth amendment. The court rejected this argument and held that prosecutorial discretion was analytically distinguishable from the post-conviction discretion that has served as the focus of the Supreme Court's concern in its death penalty jurisprudence. "The concern of the Court has been to limit and channel the discretion of the sentencing body—i.e., the judge or jury—which actually *imposes* the sentence in a given case." *Silagy,* 905 F.2d at 993 (emphasis in original). Because the prosecutor's decision to commence or forego a death sentence hearing is not a decision to "impose" a death sentence, this court held that the prosecutor's decision does not implicate the Court's eighth amendment concerns. *Id.*[18]

### b. lack of pretrial notice

■ In *Silagy,* the petitioner argued that the Illinois death penalty statute is violative of the sixth amendment right to effective assistance of counsel because the defendant is not given notice until after the adjudication of guilt that the state plans to seek the death penalty. It was argued that the Supreme Court's decision in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), protects a criminal defendant from circumstances in which prejudice to a defense counsel's ability to function effectively may be presumed. However, this court found that "certain pretrial knowledge" that the State intends to pursue the death penalty in a given case is not required to protect a defendant's sixth amendment rights.[19] The court noted that "the sixth amendment's guarantee of effective assistance of counsel is not valued for its own sake, but rather for an accused individual's ability to receive a fair trial. We do not believe that [the petitioner] received an unfair trial." *Silagy,* 905 F.2d

**18.** One member of this panel dissented from denial of rehearing en banc on this issue. *See* 905 F.2d at 1013 (Cudahy, J., dissenting from denial of rehearing en banc).

**19.** *Cf. Lankford v. Idaho,* — U.S. —, 111 S.Ct. 1723, 114 L.Ed.2d 173 (1991) (where state indi-

cated that it did not intend to seek death penalty and defense counsel and prosecutor argued only merits of concurrent or consecutive sentence terms, trial judge violated due process by sentencing defendant to death).

at 995 (citation omitted). The court added that a rule mandating certain pretrial knowledge of the state's intention to pursue the death penalty would require prosecutors to commit one way or another as to whether to pursue the death penalty without the insight into the individual characteristics of the defendant that develop at trial.

The petitioner in *Silagy* also contended that the failure to give pretrial notice of the State's intention to pursue the death penalty violated procedural due process. This court did not agree. "In that the Illinois statute does provide actual notice to a death-eligible defendant that the State intends to seek the death penalty and, thereafter, mandates that a separate sentencing hearing be conducted to determine the propriety of such a constitutional deprivation, we conclude that the Illinois statute provides for all the process which is due under the fourteenth amendment." *Id.* at 996.[20]

### c. consideration of nonstatutory factors

 Section 9–1(c) of the Illinois statute states that "[t]he court shall consider, or shall instruct the jury to consider any aggravating and any mitigating factors which are relevant to the imposition of the death penalty. Aggravating factors may include but need not be limited to [the statutory aggravating factors]." The petitioner in *Silagy* contended that the statute violates the eighth and fourteenth amendments because it fails to assure that all aggravating factors relied on by the prosecution are relevant and constitutionally permissible. However, the court noted that the statute mandated that "the jury's discretion at the selection stage of the sentencing hearing is focused on that which is 'relevant' to the task at hand." 905 F.2d at 1000. It also noted that the standard used by the Supreme Court on this issue was whether the jury's discretion was guided in a constitutionally adequate way and whether the jury's decision was so wholly arbitrary as to offend the Constitution. *See Barclay v.*

*Florida,* 463 U.S. 939, 950–51, 103 S.Ct. 3418, 3425–26, 77 L.Ed.2d 1134 (1983). Because the Illinois statute's guidance of the jury's discretion did not fail this standard, the court found the petitioner's argument meritless in *Silagy. Silagy,* 905 F.2d at 1000–01.

Although Mr. Williams certainly is entitled to request this court to reconsider its prior rulings, *see, e.g., Rheinstrom v. Commissioner,* 925 F.2d 1066, 1069 (7th Cir. 1991), he has not presented sufficient reason to overturn our established precedent. Under the doctrines of stare decisis and precedent, we conclude that Mr. Williams' challenges are controlled by *Silagy.*

### C. *Use of Peremptory Challenges to Exclude Blacks From the Jury*

Mr. Williams is black. The victim, Mrs. Goldstone, and all of the jury members were white. The jury was selected from a venire of 130 members, 28 of whom were black. Fifteen of the prospective black jurors were challenged for cause on the state's motion; two were challenged for cause on the defendant's motion. The state used eleven peremptory challenges to exclude the remaining blacks. Mr. Williams argues that the state used its peremptory challenges solely on the basis of race in violation of the fourteenth amendment, as interpreted by the Supreme Court in *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), and *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

### 1. *Contesting peremptory challenges under Swain*

 In addressing Mr. Williams' argument that the state improperly used its peremptory challenges, the Illinois Supreme Court reasoned that, under the standard established in *Swain,* "a constitutional issue of equal protection could not arise unless there was a systematic and purposeful exclusion of blacks because of race from juries in case after case." 73 Ill.Dec. at 370, 454 N.E.2d at 230. Mr. Williams

---

**20.** A member of this panel dissented from denial of rehearing en banc on this issue. *See* 905 F.2d 1014 (Cudahy, J., dissenting from denial of rehearing en banc).

presented evidence in the Illinois Supreme Court regarding the composition of 43 juries in Illinois capital cases prior to his sentence. "Over half of the juries were all white. Most of the rest of the juries contained only one black. How many peremptory challenges were exercised by the defense and by the state is not indicated. There are no other materials to illustrate that the State has regularly and systematically through the exercise of peremptory challenges excluded blacks or other minorities in case after case." *Id.* The Illinois Supreme Court determined that this showing was insufficient to meet the *Swain* standard.

In the district court, Mr. Williams proffered additional evidence in an attempt to meet the demands of *Swain:* a study by Professor Zeisel from the University of Chicago Law School that analyzed seventeen pre–1982 cases in which Cook County juries sentenced a black defendant to death; a breakdown of the composition of 32 Cook County juries in sentencing hearings in which the defendant was sentenced to death; a survey by the *Chicago Tribune* of 31 Cook County felony trials during July of 1984; and ten cases in which the Illinois Supreme Court remanded for a *Batson* hearing.[21] The district court concluded that Mr. Williams' "evidence is fatally incomplete and accordingly does not establish or suggest that the prosecution has systematically and purposefully excluded blacks from serving on capital sentencing

juries in Cook County or Illinois. At most, it suggests that predominantly white juries sentenced more blacks to death than juries constituted differently. That suggestion is not probative of the motivation that underlaid the prosecution's exercise of peremptory challenges in capital sentencing hearings systemwide." *Id.* at 487. We also must conclude that Mr. Williams' evidence does not meet the almost insuperable evidentiary barrier erected by *Swain.* As the district court noted, much of Mr. Williams' data is flawed.[22] We cannot say that Mr. Williams has presented evidence demonstrating that, "in case after case, whatever the circumstances, whatever the crime and whoever the defendant or the victim may be," the prosecution removes qualified blacks from serving as jurors through the use of its peremptory challenges. *Swain,* 380 U.S. at 223, 85 S.Ct. at 837.

That Mr. Williams is unable to meet the *Swain* standard is hardly surprising. As Justice Marshall noted in his dissent from denial of *certiorari* in the direct appeal of this case, determining that a defendant has not met the requirements of *Swain* "reflects the practical impossibility of obtaining relief under *Swain,* which offers defendants protection only if the prosecution uses peremptory challenges to exclude Negro jurors in 'case after case.' " *Williams v. Illinois,* 466 U.S. 981, 983 n. 3, 104 S.Ct. 2364, 2366 n. 3, 80 L.Ed.2d 836 (1984), (Marshall, J., dissenting from denial of *certiorari* ).[23] Because Mr. Williams has

---

**21.** *See* 742 F.Supp. at 486–87.

**22.** The district court found major deficiencies in Mr. Williams' data. Neither the study by Professor Zeisel nor the racial composition breakdown considered cases in which the jury did not impose the death penalty on a black defendant. Moreover, the racial composition breakdown did not address the prosecution's use of peremptory challenges. The *Chicago Tribune* survey indicated that, although the prosecution used 68% of its peremptory challenges to exclude blacks, 24% of the jurors who actually served were black. *See* 742 F.Supp. at 487.

**23.** Justice Marshall wrote:
The Illinois Supreme Court was critical of the study prepared by the Illinois Coalition Against the Death Penalty and presented by petitioner Williams during his appeal because the study did not indicate how many times

defense counsel and the prosecution employed peremptory challenges to exclude minorities in individual cases covered by the study. 97 Ill.2d at 273, 97 Ill.Dec. at 370, 454 N.E.2d, at 230. This criticism reflects the practical impossibility of obtaining relief under *Swain,* which offers defendants protection only if the prosecutor uses peremptory challenges to exclude Negro jurors in "case after case." Not only does the *Swain* standard make a defendant's constitutional rights contingent upon the facts of previous cases, *see McCray v. New York,* 461 U.S. 961, 964–965, 103 S.Ct. 2438, 2440–41, 77 L.Ed.2d 1322 (1983) (Marshall, J., dissenting), but a defendant's opportunity to vindicate those rights depends on other defendants' building adequate records in previous cases.
*Williams v. Illinois,* 466 U.S. 981, 983 n. 3, 104 S.Ct. 2364, 2366 n. 3, 80 L.Ed.2d 836 (1984)

failed to accomplish the practically impossible, his challenge to the State's use of its peremptory challenges must fail under *Swain.*

### 2. Contesting peremptory challenges under Batson

 In *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the Supreme Court recognized the difficult burden of proof that *Swain* imposed upon defendants, and the Court thus implemented a less demanding burden of proof. Under *Batson,* a defendant can make a prima facie showing of discrimination solely on the basis of the prosecutor's use of peremptory challenges at his own trial. A defendant must demonstrate only that the use of peremptory challenges, and any circumstances relevant in his case, raises an inference that the prosecutor used the peremptories to exclude veniremen because of their race. *Batson,* 476 U.S. at 93–96, 106 S.Ct. at 1721–23. After the defendant makes a prima facie showing, the burden shifts to the prosecutor to advance a neutral explanation for challenging the jurors. Although the prosecutor's explanation need not rise to the level of a challenge for cause, the prosecutor must do more than merely affirm his good faith; the prosecutor "must articulate a neutral explanation related to the particular case to be tried." *Id.* at 98, 106 S.Ct. at 1724.[24]

Here, the prosecution used its peremptory challenges to excuse all of the blacks from the venire for Mr. Williams' sentencing hearing. We agree with the district court that the State's "proffered[25] justifications for each of these peremptory challenges are tenuous at best." 742 F.Supp. at 488. Because the Illinois Supreme Court decided Mr. Williams' direct appeal almost three years before the Supreme Court of the United States' decision in *Batson,* however, we must determine whether *Batson* should receive retroactive application in capital cases on collateral review.

(Marshall, J., dissenting from denial of *certiorari*).

**24.** The Supreme Court has articulated the standard by which to evaluate the prosecutor's explanation: "A neutral explanation ... means an explanation based on something other than the race of the juror. At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Hernandez v. New York,* —— U.S. ——, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991).

**25.** The appellant argues:

[T]he State peremptorily challenged Ms. Brenda Jackson, who was black (Tr. 1542) on the ground that she had personal knowledge about the case (R. 13 at 65), but sought to keep Charles Lee on the jury notwithstanding that he participated in the search for the victim. (Tr. 1593–95). The State peremptorily challenged Ms. Lillian Wallace (Tr. 1929–33, 1984) for the purported reason that she had an adolescent son (R. 13 at 65), but readily accepted five white jurors who had sons in their teens and twenties: Ms. Florence Yaroch (Tr. 306–09); Mr. Richard Lucking (Tr. 1044, 1122); Ms. Louise Klein (Tr. 1056, 1032); Ms. Rose Ocwieza (Tr. 2855), and Ms. Lauren Rodia (Tr. 3132). The State peremptory challenged Ms. Theresa Powell, a black administrator for the University of Illinois, out of suspicion of "academic intellectuals" (R. 13 at 64), but accepted several white jurors of similar "academic" and "intellectual" backgrounds, such as Ms. Florence Yaroch (Tr. 266, 313–14) and Ms. Cathy Ann Savicki. (Tr. 787, 908).

The State peremptorily challenged three black women—Ms. Regina McBey (Tr. 1628, 1769), Ms. Leonora Simmons (Tr. 656–60, 725), and Ms. Judith Timmons (Tr. 2019–21)—purportedly because they were of the Baptist faith. (R. 13 at 64–65). But the State did not even inquire into the faith of white potential jurors in many cases, and, upon defense counsel's elicitation ·that white potential jurors were Protestant (Mr. William Winter; Tr. 2099), made no effort to ascertain whether the jurors were Baptist. The State peremptorily challenged Ms. Sheryl Williams, who is black (Tr. 277–82, 294), on the ground that she was young and single and a bank teller. (R. 13 at 66). But the State accepted white jurors who were young and single—Ms. Savicki and Ms. Hartrich. (Tr. 785, 1093, 1108). And the State had no objection to Ms. Shirley Young, a white bank employee. (Tr. 2069). Finally, the State peremptorily challenged Ms. Fanamae Green (Tr. 1534) for the purported reason that she was nervous and reluctant to serve. (R. 13 at 65). But the State raised no objection to Ms. Savicki, a white woman who was highly nervous (Tr. 798), or to Ms. Rose Ocwieza and Ms. Eva Hartrich (Tr. 1099–1100, 1158, 2859), two white women who expressed unwillingness to serve.

Appellant's Br. at 10–11.

### 3. *Retroactive application of Batson*
#### a. guiding principles

The purpose of federal habeas corpus is "to ensure that state convictions comply with the federal law in existence at the time the conviction became final, and not to provide a mechanism for the continuing reexamination of final judgments based upon later emerging legal doctrine." *Sawyer v. Smith*, —— U.S. ——, 110 S.Ct. 2822, 2827, 111 L.Ed.2d 193 (1990). Accordingly, the Supreme Court has held "that in both capital and non-capital cases, 'new rules will not be applied or announced in cases on collateral review unless they fall into one of two exceptions.'" *Butler v. McKellar*, 494 U.S. 407, 110 S.Ct. 1212, 1216, 108 L.Ed.2d 347 (1990) (quoting *Penry v. Lynaugh*, 492 U.S. 302, 313, 109 S.Ct. 2934, 2944, 106 L.Ed.2d 256 (1989)).[26]

■ The "new rule" principle was articulated initially by Justice O'Connor in *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) (plurality opinion). "[A] case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government. To put it differently, a case announces a new rule if the result was not *dictated* by precedent existing at the time the defendant's conviction becomes final." *Id.* at 301, 109 S.Ct. at 1070 (emphasis in original; citations omitted). The new rule principle is intended to ensure that federal habeas review is compatible with the purpose of habeas corpus articulated in *Sawyer* by validating reasonable, good-faith interpretations of existing precedent made by state courts even though these interpretations are contrary to subsequent decisions. *See Butler*, 110 S.Ct. 1212, 1217 (1990). The Court has therefore noted that almost any break with precedent constitutes a new rule.[27] If the question whether established precedent governs a case is "susceptible to debate among reasonable minds," then the current resolution will be regarded as a "new rule" and not given retroactive effect unless it falls into one of two narrow exceptions. *Butler*, 110 S.Ct. at 1217–18.

■ Under the first exception, "a new rule should be applied retroactively if it places 'certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe.'" *Teague*, 489 U.S. at 307, 109 S.Ct. at 1073 (quoting *Mackey v. United States*, 401 U.S. 667, 693, 91 S.Ct. 1160, 1180, 28 L.Ed.2d 404 (1971) (Harlan, J., concurring in judgment in part and dissenting in part)). In this case, as in *Butler*, the proscribed conduct is capital murder, the prosecution of which has not been forbidden by any statute or judicial decision. Therefore, this exception is clearly inapplicable to capital cases. *Butler*, 110 S.Ct. at 1218.

Under the second exception, a rule may be applied retroactively "if it requires the observance of 'those procedures that ... are "implicit in the concept of ordered liberty."'" *Teague*, 489 U.S. at 307, 109 S.Ct. at 1073 (quoting *Mackey v. United States*, 401 U.S. 667, 693, 91 S.Ct. 1160, 1180, 28 L.Ed.2d 404 (1971) (quoting *Palko v. Connecticut*, 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937))). However, as the Chief Justice emphasized in *Butler*, 110 S.Ct. at 1218, the Court clearly has held that this second exception is very narrow—"the scope of the second exception [is limited] to those new procedures without which the likelihood of an accurate conviction is seriously diminished. Because we operate from the premise that such procedures would be so central to an accurate determination of innocence or guilt, we believe it unlikely that many such components of basic due process have yet to emerge." *Teague*, 489 U.S. at 313, 109 S.Ct. at 1077; *see also Saffle v. Parks*, 494 U.S. 484, 110

---

26. The Supreme Court also has applied the "new rule" principle in other capital cases. *See Sawyer v. Smith*, —— U.S. ——, 110 S.Ct. 2822, 111 L.Ed.2d 193 (1990); *Saffle v. Park*, 494 U.S. 484, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990).

27. *See Sawyer*, 110 S.Ct. at 2828 (cautioning that new rule test would be "meaningless" if applied at a sufficient level of generality); *Butler*, 110 S.Ct. at 1217 ("that a court says that its decision is within the 'logical compass' of an earlier decision, or indeed that it is 'controlled' by a prior decision, is not conclusive for purposes of deciding whether the current decision is a 'new rule' under *Teague*").

S.Ct. 1257, 1263, 108 L.Ed.2d 415 (1990) (second exception limited to "watershed rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding"). "It is thus not enough under *Teague* to say that a new rule is aimed at improving the accuracy of trial. More is required. A rule that qualifies under this exception must not only improve accuracy, but also 'alter our understanding of the *bedrock procedural elements*' essential to the fairness of a proceeding." *Sawyer,* 110 S.Ct. 2822, 2831 (1990) (quoting *Teague,* 489 U.S. at 311, 109 S.Ct. at 1075) (emphasis in *Sawyer*).

#### b. application to this case

We must now determine whether the holding of the Supreme Court in *Batson* constitutes a "new rule" for purposes of habeas review. If it does, we must proceed to determine whether the exceptions to the "new rule" principle apply.

■ The question of whether *Batson* established a "new rule" is susceptible of rather straightforward resolution. As the district court held, the Supreme Court's pre-*Teague* holding in *Allen v. Hardy,* 478 U.S. 255, 258, 106 S.Ct. 2878, 2880, 92 L.Ed.2d 199 (1986) controls on this issue. In *Allen,* the Court refused retroactive application of *Batson* to proceedings on collateral review. It reasoned that such retroactive application was inappropriate because *Batson* was "an explicit and substantial break with prior precedent" and because *Batson* served constitutional interests beyond the truthfinding function. On the basis of *Allen,* we believe it is now settled that *Batson* announced a "new rule" within the meaning of *Teague* and the cases that have followed it. We recognize that *Allen* was not a capital case.

However, like our colleague in the district court, we can discern nothing in the reasoning of *Allen* to suggest that it is limited to non-capital juries.

We now examine whether either of the two exceptions of the "new rule" principle are applicable here. As we already have noted, the first exception is clearly inapplicable. *Batson* hardly places capital murder beyond the power of the criminal lawmaking authority to proscribe.

■ The second exception requires far more analysis. The Supreme Court has not ruled definitively on the question of whether the *Batson* holding is a "watershed rule[ ] of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding." *Saffle,* 110 S.Ct. at 1263.[28] Here, we must determine that issue in the special context of the capital sentencing procedure.

We do not think it can be disputed that the *Batson* holding does much to protect the fundamental fairness and truthfinding function of the criminal process. We believe that this point is especially true in capital sentencing cases and even more true when those cases involve interracial crimes. It must be remembered that the "truthfinding function" is arguably a more subtle process[29] when its aim is not ascertaining adjudicative facts but in making a life or death sentencing judgment. The Illinois capital sentencing procedure places a special premium on a racially unbiased jury. The sentencing jury, as the "conscience of the community,"[30] must *unanimously* sentence the defendant to death. Thus, if even *one* juror finds mitigating factors sufficient to preclude the imposition of the death penalty, the defendant may not be sentenced to death.

---

**28.** In *Teague,* the Supreme Court did not determine whether *Batson* comes within one of the two exceptions to the presumption against retroactive application of new constitutional rules. In *Teague,* the Supreme Court held that if the use of peremptory challenges to exclude members of a particular race would violate the Sixth Amendment's "fair cross-section" requirement, such a ruling would not be given retroactive effect because the absence of a fair cross-section

in the venire would not seriously diminish the likelihood of an accurate conviction in most cases. 489 U.S. at 314–15, 109 S.Ct. at 1077–78.

**29.** On the other hand, many aspects of ascertaining adjudicative facts, such as credibility determinations, are susceptible to deeply-rooted prejudices that are not easily identified.

**30.** *Witherspoon v. Illinois,* 391 U.S. 510, 519, 88 S.Ct. 1770, 1775, 20 L.Ed.2d 776 (1968).

With respect to this case, two factors make the foregoing considerations a matter of significant concern. First, the crimes involved here are particularly susceptible to racial prejudice and passion. Because of the great discretion entrusted to a jury in a capital sentencing hearing, a unique opportunity exists for racial prejudice to operate but remain undetected. *Turner v. Murray,* 476 U.S. 28, 35, 106 S.Ct. 1683, 1688, 90 L.Ed.2d 27 (1986). "More subtle, less consciously held racial attitudes could also influence a juror's decision.... Fear of blacks, which could easily be stirred up by the violent facts of [the defendant's] crime, might incline a juror to favor the death penalty." *Id.* As the Illinois Supreme Court recently noted:

> In a case where the defendant is black and the victim is white, we recognize, at the *prima facie* stage of establishing a *Batson* claim, that there is a real possibility that the prosecution, in its efforts to procure a conviction, will use its challenges to secure as many white jurors as possible in order to enlist any racial fears or hatred those white jurors might possess.

*People v. Henderson,* 142 Ill.2d 258, 154 Ill.Dec. 785, 800, 568 N.E.2d 1234, 1249 (1991). This is not to say that any particular juror or jury has been influenced by racial prejudice.[31] We merely recognize that "[o]nce rhetoric is put aside, it is plain that there is some risk of racial prejudice influencing a jury whenever there is a crime involving interracial violence; the only question is at what point that risk

becomes constitutionally unacceptable." *Turner,* 476 U.S. at 36 n. 8, 106 S.Ct. at 1688 n. 8 (citation omitted).[32]

Second, we cannot ignore the possibility that a black juror might well have been more receptive to Mr. Williams' arguments in mitigation than a white juror. Mr. Williams presented evidence to the effect that he was a product of the urban ghetto; he claimed that his sister was raped when he was unable to escort her home because the police had delayed him in order to question him about the disappearance of a bicycle; he suggested that his behavior could be attributed in part to the shock that resulted from the brutalization of his sister, and the resultant destructive impact upon his family. Obviously, whether such a background impacts upon a juror's capital sentencing decision is an individual, subjective decision. Indeed, capital sentencing necessarily is based on subjective determinations. "In a capital sentencing before a jury, the jury is called upon to make a 'highly subjective, "unique, individualized judgment regarding the punishment that a particular person deserves."'" *Turner,* 476 U.S. at 33–34, 106 S.Ct. at 1686–87 (quoting *Caldwell v. Mississippi,* 472 U.S. 320, 340 n. 7, 105 S.Ct. 2633, 2645 n. 7, 86 L.Ed.2d 231 (1985) (quoting *Zant v. Stephens,* 462 U.S. 862, 900, 103 S.Ct. 2733, 2755, 77 L.Ed.2d 235 (1983) (Rehnquist, J., concurring in judgment))). A black juror, giving weight only to appropriate considerations, could well have been more empathetic and receptive to Mr. Williams' mitigation evidence.

---

**31.** Like the Court in *Turner,* we simply recognize that "jurors in a capital case *may* harbor racial bias;" we do not presume that any particular juror was in fact racially prejudiced. *Turner,* 476 U.S. at 36 n. 8, 106 S.Ct. at 1688 n. 8 (emphasis in original).

**32.** The Court repeatedly has recognized that racial prejudice continues to rear its head in this country. *See, e.g., Rosales–Lopez v. United States,* 451 U.S. 182, 192, 101 S.Ct. 1629, 1636, 68 L.Ed.2d 22 (1981) ("It remains an unfortunate fact in our society that violent crimes perpetrated against members of other racial or ethnic groups often raise [a reasonable possibility that racial prejudice would influence the jury]."); *Press–Enterprise Co. v. Superior Court*

*, California,* 464 U.S. 501, 521, 104 S.Ct. 819, 830, 78 L.Ed.2d 629 (1984) (Marshall, J., concurring in judgment) (recognizing "the history and continuing legacy of racism in our country"); *Dukes v. Waitkevitch,* 429 U.S. 932, 932–33, 97 S.Ct. 340, 340, 50 L.Ed.2d 302 (1976) (Marshall, J., dissenting from denial of *certiorari*) (in interracial rape case in city where racial conflict is close to the surface, "it blinks reality to conclude ... that '[t]he circumstances did not suggest a significant likelihood that racial prejudice might infect petitioner's trial'") (quoting *Ristaino v. Ross,* 424 U.S. 589, 598, 96 S.Ct. 1017, 1022, 47 L.Ed.2d 258 (1976)); *see generally Powell v. Alabama,* 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932).

"The Court ... has recognized that the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination." *Turner*, 476 U.S. at 35, 106 S.Ct. at 1688 (quoting *California v. Ramos*, 463 U.S. 992, 998–99, 103 S.Ct. 3446, 3451–52, 77 L.Ed.2d 1171 (1983)). Given the heightened scrutiny required in capital cases, the possibility of prejudice inherent in interracial crimes, the nature of the mitigation evidence introduced by Mr. Williams, and the prosecution's questionable use of its peremptory challenges to exclude all blacks from the jury, Mr. Williams' contentions cannot be dismissed lightly. Nor can we dismiss institutional considerations recently articulated by the Supreme Court. In extending *Batson* to civil juries, the Supreme Court stressed the institutional concern of a justice system free of racial bias.[33] In another context, the Chief Justice recently noted that "[f]ew, if any, interests under the Constitution are more fundamental than the right to a fair trial by 'impartial' jurors...." *Gentile v. State Bar of Nevada,* —— U.S. ——, 111 S.Ct. 2720, 2745, 115 L.Ed.2d 888 (1991).

We must acknowledge, however, that, despite the foregoing considerations, other countervailing factors must be weighed in our judgment. These are not factors that we have a right to evaluate *de novo*. This is an *intermediate* appellate court and its judges are bound to give respectful deference to the opinions of the Supreme Court. As we have noted already, the scope of review of federal habeas corpus proceedings has been a matter of great attention by the Court and its opinions delineate important considerations that must be weighed in our determination as to whether application of *Batson* in capital sentencing hearings falls within an exception to the "new rule" principle of *Teague*.

At the outset, we must remember that, in *Allen*, the Court refused to give *Batson* retroactive application. Although *Allen* did not utilize the retroactivity test adopted by the Supreme Court in *Teague*, the *Teague* test is (almost indisputably) more restrictive.[34] As our colleagues in the Fifth Circuit have recognized, the Court's characterization of *Batson*'s significance makes its retroactive application unlikely under the analytical framework of *Teague*—even in a capital case.[35] In *Allen*, the Court held that *Batson* did not go "to the heart of the truthfinding function." 478 U.S. at 259, 106 S.Ct. at 2880 (quoting *Solem v. Stumes*, 465 U.S. 638, 645, 104 S.Ct. 1338, 1343, 79 L.Ed.2d 579 (1984)). The Court recognized that "the rule in *Batson* may have *some* bearing on the truthfinding function of a criminal trial.... [But] we cannot say that the new rule has such a fundamental impact on the integrity of factfinding as to compel retroactive application." *Id.* (emphasis supplied). The Supreme Court noted that "the new rule joins other procedures that protect a defendant's interest in a neutral factfinder. Those oth-

---

**33.** *See Edmonson v. Leesville Concrete Co.,* —— U.S. ——, 111 S.Ct. 2077, 2087, 114 L.Ed.2d 660 (1991) ("Racial bias mars the integrity of the judicial system and prevents the idea of a democratic system from becoming a reality."); *see also Powers v. Ohio,* —— U.S. ——, 111 S.Ct. 1364, 1366, 113 L.Ed.2d 411 (1991) ("racial discrimination in the qualification or selection of jurors offends the dignity of persons and the integrity of the courts").

**34.** In *Allen*, the Court wrote that "[r]etroactive effect is 'appropriate where a new constitutional principle is designed to enhance the accuracy of criminal trials,' but the fact that a rule may have some impact on the accuracy of a trial does not compel a finding of retroactivity. Instead, the purpose to be served by the new standard weighs in favor of retroactivity where the stan-

dard 'goes to the heart of the truthfinding function.'" 478 U.S. at 259, 106 S.Ct. at 2880 (citations omitted) (quoting *Solem v. Stumes*, 465 U.S. 638, 643, 645, 104 S.Ct. 1338, 1341, 1343, 79 L.Ed.2d 579 (1984)). This approach is similar to the first requirement of the second *Teague* exception (new rule must be aimed at improving the accuracy of trial). Under *Teague*, however, "more is required"—the new rule must also alter our understanding of a bedrock procedural element. *Sawyer*, 110 S.Ct. at 2831.

**35.** The Fifth Circuit also has held, on the basis of the Supreme Court's decision in *Allen*, that *Batson* should not receive retroactive application in capital cases. *See Prejean v. Smith*, 889 F.2d 1391, 1396–97 (5th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1836, 108 L.Ed.2d 964 (1990).

er mechanisms existed prior to ... *Batson*, creating a high probability that the individual jurors seated in a particular case were free from bias." *Id.* (footnote omitted). Therefore, the Court clearly did not believe that *Batson* implicated the fundamental fairness and accuracy of criminal proceedings in *Allen*. As we have noted already, sentencing in a capital case is an especially delicate task to entrust to jurors. Yet, as the Fifth Circuit pointed out, the same procedural devices available to ferret out or control passion and prejudice in an adjudication of guilt—voir dire and jury instructions—are available in the capital sentencing situation. *See Prejean v. Smith*, 889 F.2d 1391, 1397 (5th Cir.1989), *cert. denied*, — U.S. —, 110 S.Ct. 1836, 108 L.Ed.2d 964 (1990).

More fundamentally, *Batson* does not appear, in the parlance of *Teague*, to alter an understanding of a "bedrock procedural element." *See Teague*, 489 U.S. at 311–15, 109 S.Ct. at 1075–78. *Batson* undoubtedly implicates important considerations; but it is not analytically the equivalent of the Court's proffered example of a "bedrock principle"—the right to be represented by an attorney in all criminal trials for serious offenses (recognized in *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963)). Although it created a significant break with prior precedent by easing the evidentiary burden of a defendant who contested the state's use of peremptory challenges, *Batson* did not create the underlying constitutional principle that blacks may not be systematically excluded from jury service. This distinction goes to *Strauder v. West Virginia*, 100 U.S. 303, 25 L.Ed. 664 (1880), and *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965).

While the precise question before us has yet to be decided by the Supreme Court,[36]

## D. *Victim Impact Evidence*

Mr. Williams contests the admission into his capital sentencing hearing of what he characterizes as victim impact evidence. On cross-examination, counsel for Mr. Williams requested that probation officer Swies read aloud from the victim impact statement that he had prepared during the presentence interview.[37] The part of the statement that Swies read was written by Mr. Williams' counsel and indicated that Mr. Williams "recognized responsibility for his conduct, was cooperative, and thought he could help others if he were allowed to live by showing through example the consequences of his conduct." 73 Ill.Dec. at 383, 454 N.E.2d at 243. On redirect examination, Swies read, at the request of the state and over the objection of Mr. Williams, the following portion of the victim impact statement:

> Personal injury was death. The financial losses are not measurable. The victim, Linda Goldstone, was a 29–year–old mother of a 3–year–old son, the wife of a doctor. The impact that this crime had upon her immediate family, not to mention the parents of this woman, cannot be adequately put into words. The grief and sorrow inflicted upon them by this one man's deed is sufficiently aggravated to justify the death penalty. The loss of this woman to society will go unmeasured in time. She was on her way to teach a course in the Lamaze method of childbirth when her—when

we believe the existing case law requires us to hold that the rule in *Batson* may not be applied retroactively. At this point in the development of the case law, if a deviation from the course we have discerned is to come, it must come from the Supreme Court.

---

**36.** *See Teague*, 489 U.S. at 319 n. 2, 109 S.Ct. at 1079 n. 2.

**37.** Illinois law requires that a victim impact statement be included in presentence reports: a) The presentence report shall set forth:

 (3) the effect the offense committed has had upon the victims thereof, and any compensatory benefit that various sentencing alternatives would confer on such victim or victims.

Ill.Rev.Stat. ch. 38, ¶ 1005–3–2.

Williams abducted her. The irony is apparent. A woman and her husband, an obstetrician, devoted to assisting in giving life. A criminal bent upon taking it away.

Tr. 4377.

In *Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), the Court held that the Eighth Amendment prohibits a jury from considering a victim impact statement at the capital sentencing stage. However, in *Payne v. Tennessee,* — U.S. ——, 111 S.Ct. 2597, 2611, 115 L.Ed.2d 720 (1991), the Supreme Court explicitly overruled *Booth.* "We are now of the view that a State may properly conclude that for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant." *Id.* 111 S.Ct. at 2608. The Court held that the state should be entitled to " 'counteract[ ] the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family.' " *Id.* (quoting *Booth,* 482 U.S. at 517, 107 S.Ct. at 2540) (White, J., dissenting) (citation omitted). The Court thus held that the "Eighth Amendment erects no *per se* bar" to the use of victim impact evidence. *Id.* 111 S.Ct. at 2609.

The Court did not hold that states must, or even should, admit victim impact evidence. Moreover, the Court did not immunize victim impact statements from habeas review. "If, in a particular case, a witness' testimony or a prosecutor's remark so infects the sentencing proceeding as to render it fundamentally unfair, the defendant may seek appropriate relief under the Due Process Clause of the Fourteenth Amendment." *Id.* at 2612 (O'Connor, J., concurring). "[T]he appropriate standard of review for such a claim on writ of habeas corpus is 'the narrow one of due process, and not the broad exercise of supervisory power.' " *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464,

2471, 91 L.Ed.2d 144 (1986) (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 642, 94 S.Ct. 1868, 1872, 40 L.Ed.2d 431 (1974)). Thus, our review is limited to whether the use of the victim impact statement made Mr. Williams' sentencing hearing "so fundamentally unfair as to deny him due process." *Donnelly,* 416 U.S. at 645, 94 S.Ct. at 1872.

 In applying this standard to the facts of Mr. Williams' sentencing hearing, we cannot say that his trial was rendered unfair by the use of the victim impact statement. The victim impact statement was relatively brief, especially when compared to the overwhelming amount of aggravating evidence admitted. The court instructed the jury to avoid passion and sympathy in reaching its decision. *See* 742 F.Supp. at 485; Tr. 5488. Finally, although the state did use victim impact as a theme in its closing argument, the prosecutor's use of the victim impact evidence was not so inflammatory as to have rendered the trial unfair. We must recognize that the state should not be required to present victim impact evidence or closing arguments that are devoid of all passion. Such sterile prosecution of heinous crimes cannot be expected, let alone required. Finally, we note that "[i]f there was any impropriety in having the lawyers' comments read, it must be kept in mind that the defense opened the door and should not complain that the prosecution also crossed the threshold." 73 Ill.Dec. at 383, 454 N.E.2d at 243. Because Mr. Williams used the mitigating evidence contained in the victim impact statement, the state clearly was entitled to "counteract" this evidence.

**E.** *Exclusion of Defense Evidence*

 We agree with the district court that it was not error to exclude proffered evidence of the lack of deterrent value of the death penalty. Such evidence cannot be characterized as mitigating evidence "bearing on the defendant's character, prior record, or the circumstances of the offense." *Lockett v. Ohio,* 438 U.S. 586, 605 n. 12, 98 S.Ct. 2954, 2965 n. 12, 57 L.Ed.2d 973 (1978); *see also Shriner v.*

*Wainwright,* 715 F.2d 1452, 1456 (11th Cir. 1983), *cert. denied,* 465 U.S. 1051, 104 S.Ct. 1328, 79 L.Ed.2d 723 (1984). Nor can we say that the state trial court violated Mr. Williams' right to a fair sentencing hearing when it excluded the testimony of a professor of psychiatry that Mr. Williams would be a good subject for further study. While the appellant refers to this evidence as "psychiatric evidence," Reply Br. at 15, *see also* Opening Br. at 37, it must be pointed out that this evidence was not proffered to elucidate Mr. Williams' state of mind at the time of the commission of the offense or his susceptibility to rehabilitation. It was offered to show that if Mr. Williams were to live and be studied by scholars, society might benefit from the study. Tr. at 5087–94.[38] It is difficult to characterize such

---

38. During his testimony, Mr. Williams testified as follows:

Q. How do you feel, now that the image of Hernando Williams as your family knew it is no longer surrounding you?

A. Well, I think the image that I have betrayed it before my family, before my friends, was a good image, but it wasn't an image that I had accepted on all choice, it was more or less given to me in ways of their own expectations of me, and—now the image that once existed was an image that enabled me to do the things to Mrs. Goldstone, because I raped her, I murdered her, it's an image that I don't know—wasn't—but it's a lot of things about what I did that I don't understand one of the reasons why, and over the 21 or 22 months that I've been here I've been able to look at what it was, the extent that I was, and somewhat understand some of the things that made me into what I was that night, or that morning.

I know that there is nothing that I could say that would every [sic] justify what I did, but through professional help since I've been here I've been able to do something that as long as I can remember I was never able to do, and that was to be not what someone expected me to be, and I am able to accept that I did those things, although I don't know the reason or—even throughout these whole procedures, there's a lot of things that I don't remember, and some of them had to be ugly and monstrous types of images that I did project during that time.

I don't want to remember. This opportunity to testify—the cruel things that I did to not just one woman but two women, is something that I think that I would never have been able to say if I hadn't had help from Doctor Freedman and Mr. Strodtbeck, they helped me I had some of the things—or with some of the things that I was, and during the time that I had these sessions I had constant thoughts of my family. I wasn't going to allow the understanding that I have had or was able to receive, that I got from Doctor Freedman, exist any longer.

I knew of the consequences or what could be the consequences of pleading guilty, but those images, that person that my family, my friends wanted me to be—right now it's my choice to be that, and although it may hurt, I can no longer be the person to deceive. This is why that I wanted to testify to what I did.

Tr. at 4977–79. After the testimony, defense counsel asked permission to amend their answer to discovery to include Dr. Freedman. Tr. at 4979. The state objected to this addition at that later date. The defense represented that "Dr. Freedman had an occasion to see my client over two years of therapy sessions with him." Tr. at 4981. They also claimed that Dr. Freedman's testimony

would, of course, be as to his opinion on whether or not Hernando Williams should live or die, based on what he knows of Hernando Williams, just as Reverend Feamster was allowed to testify, just as any clergyman or any doctor who has had contact with a defendant would be allowed to testify at a sentencing hearing; he would be allowed to testify as to his opinion on whether or not he should live or die. It would be based on what he knows from his contact with my client, Judge, and not on anything short of that.

Tr. at 4983. The trial court agreed to hear, out of the presence of the jury, testimony of Dr. Freedman. Defense counsel introduced the testimony by representing:

Dr. Freedman will testify much as Mr. Shabat has told you. He will testify that there is value in seeing Hernando Williams being kept alive so that Dr. Freedman can develop an understanding of Hernando, but on the wider scope, and what is important to all of us in this courtroom is so that people like Dr. Freedman can develop insight and understanding into the minds of violent offenders so that they may somehow help all of us prevent this from occurring again. That has a great social utilitarian value.

Mr. Shabat has spoken, from time to time, that the Legislature in Illinois has clearly determined that the death penalty is moral. That it is proper. And it has great utilitarian value. Dr. Freedman will not come before you and say that the death penalty is none of those things. He will, if allowed to testify, will testify to your Honor, and to the jury, that keeping this man alive behind bars has social significance and meaning for our society and it's something that we should consider before this jury decides whether or not his life should be taken.

Tr. at 5081–82. Again, counsel represented:

This is a doctor who has spent many hours with our client. He is not coming in to say that he is insane in the traditional sense of the

testimony as "bearing on the defendant's character, prior record, or the circumstances of the offense." *Lockett*, 438 U.S. at 605 n. 12, 98 S.Ct. at 2965 n. 12. Therefore, the state Supreme Court was correct in ruling that it was not error to preclude such testimony. *See People v. Williams*, 97 Ill.2d 252, 73 Ill.Dec. 360, 384, 454 N.E.2d 220, 244 (1983).

■ However, even if we were to give *Lockett* and its progeny [39] an expansive reading, as the district court apparently did, such an exclusion would be harmless beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). In order to find an error harmless beyond a reasonable doubt, we must determine whether it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id.* at 24, 87 S.Ct. at 824; *see also United States ex rel. Savory v. Lane*, 832 F.2d 1011, 1019 (7th Cir.1987). "To say that an error did not contribute to the verdict is ... to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." *Yates v. Evatt*, —— U.S. ——, 111 S.Ct. 1884, 1893, 114 L.Ed.2d 432 (1991). When viewed in conjunction with the other evidence presented in this case, exclusion of Mr. Williams' "psychiatric evidence," of the type and quality contained in the proffer, even if erroneous, clearly did not contribute to the verdict.

## F. Prosecutorial Misconduct

■ As he did before the district court, Mr. Williams also argues that pervasive misconduct by the prosecution rendered his sentencing proceeding unfair. In evaluating a claim of prosecutorial misconduct as a violation of the petitioner's due process right to a fair trial, the inquiry is whether the prosecutor's statements " 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974)); *see also United States v. Torres*, 809 F.2d 429, 435 (7th Cir.1987). We examine the trial in its entirety to determine whether the prosecutor's comments violated due process. *See Shepard v. Lane*, 818 F.2d 615, 621 (7th Cir.), *cert. denied*, 484 U.S. 929, 108 S.Ct. 296, 98 L.Ed.2d 256 (1987); *United States ex rel. Crist v. Lane*, 745 F.2d 476, 482 (7th Cir.1984), *cert. denied*, 471 U.S. 1068, 105 S.Ct. 2146, 85 L.Ed.2d 503 (1985). "[T]he well-settled standard of review [is] that we are to consider the prosecutor's conduct not in isolation, but in the context of the trial as a whole, to determine if such conduct was 'so inflammatory and prejudicial to the defendant ... as to deprive him of a fair trial.' " *United States v. Chaimson*, 760 F.2d 798, 809 (7th Cir.1985) (quoting *United States v. Zylstra*, 713 F.2d 1332, 1339 (7th Cir.), *cert. denied*, 464 U.S. 965,

---

word. He is not coming in to lay a diagnostic label on our client in an attempt to fog over the issue that is presented to the jury. He is coming in to say that there is value in keeping this man alive so that we can study him. Not only will we learn about him, but hopefully, we will learn about other people. And isn't that something that the jury as representing the conscious [sic] of the community should have before them.
Tr. at 5085. Dr. Freedman testified as follows:
 Q. Doctor, if Mr. Williams is allowed to live the rest of his life in prison, would you like to continue to see him?
 A. Yes.
 Q. In a professional basis?
 A. Yes. I feel that it is very important to understand the psychological mechanisms that are responsible for these tragedies.

Q. In addition to the value that you would get from studying Mr. Williams and the value he would get from you participating with him in an understanding, would there be any value to the rest of society from being able to do what you would propose to do?
 A. I would hope so. I would hope that understanding the mechanisms present within him could be applied to, and of course, would be published, be disseminated among other studies of aggressive and violence, and perhaps be applied in a preventive fashion and other specialities [sic] of medicine.
Tr. at 5091–92.

**39.** *See Hitchcock v. Dugger*, 481 U.S. 393, 399, 107 S.Ct. 1821, 1824, 95 L.Ed.2d 347 (1987); *Skipper v. South Carolina*, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986).

104 S.Ct. 403, 78 L.Ed.2d 344 (1983)). As the district court correctly noted, however, the stakes of a capital sentencing hearing require us to give heightened scrutiny to the prosecutor's conduct.[40]

■ Mr. Williams argues that the prosecution ignored court rulings when it told the jury that Mr. Williams should be sentenced to death in order to send a message to the entire community that such behavior will not be tolerated. He contends that this argument highlighted that he had not presented any psychiatric testimony, and made several references to Mr. Williams' possible release from prison if the jury should fail to sentence him to death. The district court stated that "[s]ome of these actions did not constitute misconduct. Those statements that may be viewed as conscious attempts to ignore a court ruling and to exceed evidentiary bounds were infrequent in light of the volume and nature of the total evidence submitted by the prosecution." 742 F.Supp. at 491. We agree. Although the trial court sustained defense objections to each of the prosecutorial comments made above, it does not follow that Mr. Williams was sentenced to death because, of the objectionable comments made by the prosecutor, most of which occurred at the end of a six-week sentencing hearing. Mr. Williams confessed that he abducted Mrs. Goldstone; that he held her captive in the trunk of his car for 36 hours; that he raped her twice; and that he murdered her by shooting her in the chest and head while she knelt in front of him. We are confident that Mr. Williams' sentence was a result of his own conduct, not of comments made by the prosecutor.

Mr. Williams also takes issue with comments made by the prosecution that were directed toward the defense counsel.[41] We agree with the district court that these statements amount to little more than sar-castic comments about the merit of Mr. Williams' arguments. *Cf. United States v. Turk*, 870 F.2d 1304, 1308–09 (7th Cir. 1989). In light of the entire record in this case, regardless of the characterization of these comments, it is very unlikely that the prosecution's comments infected the trial with unfairness or had any influence on the jury's decision.

In reviewing the trial transcript, two additional factors support our conclusion that Mr. Williams' rights were not prejudiced by the prosecutor's remarks. First, the trial judge sustained the defense's objections and admonished the jury to disregard the utterances. Tr. 5476–78, 5482. Second, the jury was explicitly instructed that it should consider as evidence only the testimony of witnesses and the exhibits that the court received; the jury also was instructed that the arguments of counsel are not evidence. Tr. 5491.

### G. *Use of Williams' "Silence"*

■ After Williams pleaded guilty, he orally and in writing requested a presentence investigation. Edward Swies, the probation officer who conducted the presentence investigation, gave the following testimony at the sentencing hearing:

Q. When you asked [Williams] about the charge for which he pled guilty of Linda Goldstone, he didn't speak to you about that, did he?

A. He stated to me, "No comment."

Tr. 4369. Swies also testified that the defendant did not express any remorse or feelings of regret. On cross-examination, he acknowledged that he did not have any educational background in either psychiatry or psychology. On re-direct examination, Swies again expressed his opinion that the defendant did not seem remorseful at the presentence interview.

---

**40.** *See* 742 F.Supp. at 490.

**41.** Mr. Williams pressed the following examples to the district court:

After a defense objection in the state's opening statement, the prosecutor said "I don't know what they are trying to hide." Tr. 4213.

The prosecutor interrupted defense counsel's opening statement and said "It's false." Tr. 3215. In closing, the prosecution referred to defense arguments as "bunk," that Williams was playing a shell game and that the jurors should not "buy it." Tr. 5483. 742 F.Supp. at 490 n. 24. Mr. Williams relies on these same instances on appeal.

### a. absence of *Miranda* warnings

Mr. Williams argues that the introduction of these statements into evidence violated his fifth amendment privilege against self-incrimination. He asserts that the questioning by probation officer Swies constituted custodial interrogation, and that the state therefore was precluded from using any statements from this interrogation unless either *Miranda* warnings were given or procedural safeguards effective to secure the privilege against self-incrimination were demonstrated.

The Second Circuit recently has considered and rejected an argument identical to that made by Mr. Williams.

The requirement that *Miranda* warnings be given to a defendant is an attempt to give "the *defendant* the power to exert some control over the course of the interrogation." *Moran v. Burbine*, 475 U.S. 412, 426 [106 S.Ct. 1135, 1143, 89 L.Ed.2d 410] (1986). In light of the knowledge available to a defendant concerning the content of the presentence interview and the consequences of his responses to a probation officer's questions, we do not think that the Fifth Amendment requires a probation officer to give *Miranda*-type warnings prior to a routine presentence interview. It is quite likely that a defendant will be aware of his Fifth Amendment rights before the presentence interview is conducted, and in any event his attorney knows that there will be a presentence interview and can advise the defendant accordingly. The defendant is thus capable of exerting control over the course of the presentence interview, the significance of which is heightened in this custodial setting by the fact that the questions are asked by a neutral information gatherer for the court rather than by the police or prosecution, the parties most likely to coerce the defendant into relinquishing his Fifth Amendment rights and the parties against whom *Miranda* ordinarily applies.

*United States v. Cortes*, 922 F.2d 123, 127 (2d Cir.1990) (emphasis in original).[42]

We find the reasoning of the Second Circuit persuasive. A defendant is not required to speak to a probation officer or to aid in the presentence report. Mr. Williams *voluntarily* spoke to Swies after *requesting* the interview and after *consulting* with counsel. "Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. There is no requirement that police stop a person ... who calls the police to make a confession *or any other statement he desires to make*. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." *Miranda v. Arizona*, 384 U.S. 436, 478, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966) (emphasis supplied). "The warning mandated by *Miranda* was meant to preserve [the fifth amendment] privilege during 'incommunicado interrogation of individuals in a police-dominated atmosphere.'" *Illinois v. Perkins*, —— U.S. ——, 110 S.Ct. 2394, 2397, 110 L.Ed.2d 243 (1990) (quoting *Miranda*, 384 U.S. at 445, 86 S.Ct. at 1612). When a defendant, after consultation with counsel, requests an interview with his probation officer, the concerns underlying *Miranda* simply are not present. *See Minnesota v. Murphy*, 465 U.S. 420, 432–33, 104 S.Ct. 1136, 1144–45, 79 L.Ed.2d 409 (1984) (interview with probation officer does not constitute custodial interrogation); *cf. Roberts v. United States*, 445 U.S. 552, 560–61, 100 S.Ct. 1358, 1364–65, 63 L.Ed.2d 622 (1980) (finding no custodial interrogation where defendant, after discussion with counsel, initiated interview with investiga-

---

**42.** Other circuits are in agreement with the Second Circuit. *See United States v. Rogers*, 921 F.2d 975, 979 (10th Cir.1990); *United States v. Miller*, 910 F.2d 1321, 1326 (6th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 980, 112 L.Ed.2d 1065 (1991); *Baumann v. United States*, 692 F.2d 565, 576–77 (9th Cir.1982); *see also United States v. Jackson*, 886 F.2d 838, 841–42 n. 4 (7th Cir.1989). *But see Jones v. Cardwell*, 686 F.2d 754, 756 (9th Cir.1982).

tors).[43] Accordingly, probation officer Swies was not required to give Mr. Williams *Miranda* warnings before conducting the presentence interview.

*Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981) is not to the contrary. In that capital punishment case, the defendant was interviewed before trial by a court-appointed psychiatrist. The purpose of the "neutral competency examination," *id.* at 467, 101 S.Ct. at 1875, was to determine whether the defendant was competent to stand trial. The defendant was not given *Miranda* warnings prior to the examination. Nevertheless, the examining psychiatrist later testified as a state witness during the penalty phase.[44] He testified that the defendant was a very severe sociopath who showed no remorse for his actions and would commit similar crimes if given the opportunity. *Id.* 451 U.S. at 459–60, 101 S.Ct. at 1871–72. While explicitly limiting its holding to "the circumstances of this case," *id.* at 461, 101 S.Ct. at 1872, the Supreme Court held that the state trial court had committed error in admitting the psychiatrist's testimony. Wrote Chief Justice Burger:

> During the psychiatric evaluation, respondent assuredly was "faced with a phase of the adversary system" and was "not in the presence of [a] perso[n] acting solely in his interest." Yet he was given no indication that the compulsory examination would be used to gather evidence necessary to decide whether, if convicted, he should be sentenced to death. He was not informed that, accordingly, he had a constitutional right not to answer the questions put to him.

*Id.* at 467, 101 S.Ct. at 1875 (citation omitted). He continued:

> A criminal defendant, who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence, may not be compelled to respond to a psychiatrist, if his statements can be used against him at a capital sentencing proceeding.

*Id.* at 468, 101 S.Ct. at 1876. Notably, the Supreme Court specifically emphasized that the same fifth amendment concerns are not "necessarily presented by all types of interviews and examinations that might be ordered or relied upon to inform a sentencing determination." *Id.* at 469 n. 13, 101 S.Ct. at 1876 n. 13.

In our view, there are significant differences between this case and *Estelle* that require a different result. In *Estelle,* the interview was involuntary. Moreover, the defendant was not apprised of the scope of the interview's purpose and therefore was deprived of the opportunity to make a reasoned choice, with the advice of counsel,[45] with respect to his participation. By contrast, Mr. Williams, after consulting with counsel, requested this interview and knew that the purpose of the interview was to prepare for the capital sentencing phase of his trial. Under these circumstances, the general rule employed in the circuits is applicable; *Miranda* warnings are not required before a probation officer's presen-

---

**43.** The Supreme Court's holding in *Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975) is not implicated here. Even if we assume that Mr. Williams' "no comment" response was a reassertion of his Fifth Amendment privilege, the state did not seek to use any subsequent statements. Therefore, the Court's conclusion in *Mosley* ("statements obtained after the person has decided to remain silent" are inadmissible) is inapplicable. *Id.* at 104, 96 S.Ct. at 326.

**44.** We also note that, in *Estelle,* the Supreme Court characterized the psychiatrist as "an agent of the State recounting unwarned statements made in a postarrest custodial setting." 451 U.S. at 467, 101 S.Ct. at 1875. The Court based

this characterization on the psychiatrist's going beyond the role originally set at the time of the competency examination and assuming a prosecutorial role in an entirely different phase of the trial. *See id.* Here, of course, no such unexpected role shifting occurred. The probation officer fulfilled one role. While he was called by the prosecution, there is no indication that he was not available equally to the defense, and indeed he was cross-examined extensively—and effectively—on the accuracy of his estimation that the defendant showed no remorse.

**45.** The Supreme Court also determined that the defendant had been deprived of his sixth amendment right to counsel. 451 U.S. at 454–55, 101 S.Ct. at 1868–69.

tence interview.[46]

### b. fifth amendment concerns

Mr. Williams also argues that the use of the "no comment" response was an improper use of the invocation of his fifth amendment rights. He contends that the state used this fifth amendment invocation as substantive evidence that he lacked remorse in violation of *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). Our review of the record has caused us to reach a different conclusion. Swies did testify that Mr. Williams did not express remorse and did not appear remorseful. Nowhere, however, did Swies testify that his conclusion was based on Mr. Williams' "no comment" response. Indeed, the state did not refer to Mr. Williams' "no comment" response during the remainder of the sentencing hearing and Swies did not mention this response again during his testimony.[47] The use of the "no comment" response amounted to

no more than providing the jury with a complete picture of the presentence interview—the jury would have thought the interview was strange indeed if Swies had failed to ask Mr. Williams about the murder of Mrs. Goldstone. *Cf. Rogers v. United States*, 340 U.S. 367, 371, 71 S.Ct. 438, 441, 95 L.Ed. 344 (1951) (refusing to uphold fifth amendment privilege if invocation "would open the way to distortion of facts by permitting a witness to select any stopping place in the testimony"); *United States v. Davenport*, 929 F.2d 1169, 1175 (7th Cir.1991) ("outside the coercive setting of a custodial interrogation, willingness to answer some questions can properly be given greater weight in deciding whether that willingness should forfeit the right to object to comment on a refusal to answer a particular question").

Even if we were to find a fifth amendment violation, we are confident that the "no comment" reply related by Mr. Swies did not contribute to the jury's decision.[48] Indeed, we cannot see how it could

---

**46.** We do not believe that *Baumann v. United States*, 692 F.2d 565 (9th Cir.1982), mandates a contrary result. In *Baumann*, a non-capital case, the Ninth Circuit held that *Miranda* warnings were not required before a routine probation officer's interview for the preparation of a presentence report in a non-capital case. The court distinguished *Estelle* on the ground that it involved the use of the psychiatrist's testimony in determining whether the defendant met one of the three statutory factors that, if found, required the imposition of the death penalty. *See Baumann*, 692 F.2d at 576 n. 4; *cf. Estelle*, 451 U.S. at 457–58, 101 S.Ct. at 1870–71 (describing the Texas death penalty statute at issue). While the Ninth Circuit clearly was correct in distinguishing its case on this basis, we do not believe, for the reasons set forth in the text, that *Estelle* governs all instances when a probation officer sets out to prepare a presentence report in a death penalty case.

**47.** Mr. Swies' conclusion that Mr. Williams lacked remorse may well have been based on Mr. Williams' other comments, demeanor, and inability to express remorse.

Q. [By State]. Did you ask him how he felt about what had happened in the case?
A. Yes, I did.
Q. How his wife felt?
A. Yes.
Q. What did he say?
A. He stated to me that himself and his wife had an understanding of what has happened and that life must go on....

....
Q. Okay. When you spoke with Hernando Williams on the 10th of October, ... did the defendant ever express to you any remorse for what he had pled guilty to and what he had done?
....
Q. Do you understand the question?
A. Yes, I do. He did not express any remorse.
Q. Nor did he express any feelings of remorse?
A. No, he did not.
Tr. 4368–71.
Later, on re-direct examination, the following dialogue took place between the State and Swies:
Q. At any time during your interview while you observed Hernando Williams, did he seem remorseful?
....
A. No, he did not.
Tr. 4378.

**48.** *See Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). In order to find an error harmless beyond a reasonable doubt, we must determine whether it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967); *see also United States ex rel. Savory v. Lane*, 832 F.2d 1011, 1019 (7th Cir.1987). "To say that an error did not 'contribute' to the ensuing verdict

have contributed to the jury's estimation of Mr. Williams' remorse. Most fundamentally, the jury was offered a far greater opportunity to form an opinion on this issue as it listened to Mr. Williams' own extensive testimony. In that testimony, he described the crimes against Mrs. Goldstone as well as his earlier assault on Mrs. Krone. His motivations as well as his post-arrest reflections were aired thoroughly before the jury. From this testimony and through observing the demeanor of the defendant, the jury was certainly focused on whether Mr. Williams had any remorse. As the district court pointed out, the jury also was entitled to examine Mr. Williams' actions during and immediately after the commission of the crime in determining whether he showed remorse.[49] On the other hand, as the Illinois Supreme Court noted, the prosecution never referred to the "no comment" response.[50] Although the prosecution did mention Mr. Williams' lack of remorse, these statements were based on the defendant's testimony and demeanor during trial, not on Swies' "no comment" reference. Id. Because the State never referred to Mr. Williams' comment, presented abundant evidence that Mr. Williams lacked remorse, and Mr. Williams' comment had very limited probative value, we agree with the district court that the admission of Swies' statement was, at worst, harmless error.

is not, of course, to say that the jury was totally unaware of that feature of the trial later held to have been erroneous.... To say that an error did not contribute to the verdict is, rather, to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." *Yates v. Evatt*, ——— U.S. ———, 111 S.Ct. 1884, 1893, 114 L.Ed.2d 432 (1991).

**49.** *See* 742 F.Supp. at 492.

**50.** *See* 73 Ill.Dec. at 382, 454 N.E.2d at 242.

**51.** These factors fell under the following two subsections in the Illinois Death Penalty Statute:
6. The murdered individual was killed in the course of another felony if:
(a) The murdered individual was actually killed by the defendant and not by another party to the crime or simply as a consequence of the crime; and

### H. Aggravating Factors

In the eligibility phase, the sentencing jury found beyond a reasonable doubt that Mr. Williams murdered Linda Goldstone in the course of armed robbery, aggravated kidnapping and rape, and that he murdered an eyewitness to those crimes. Therefore, the state had proven two statutory aggravating factors[51] justifying movement to the aggravation/mitigation phase and ultimately to imposition of the death penalty.[52] Mr. Williams contends that the Illinois Supreme Court's interpretation of these factors as applied to this case renders the eyewitness factor unconstitutionally vague and overbroad.

Mr. Williams argues that, under Illinois law, the facts of his case did not permit the jury to find that he committed both murder in the course of a felony and murder of an eyewitness. His argument is based on *People v. Brownell*, 79 Ill.2d 508, 38 Ill. Dec. 757, 404 N.E.2d 181 (1980). In *Brownell*, the Illinois Supreme Court held that:

the aggravating factor relating to a murdered individual who was, or who may be, a witness against a defendant, or who may assist in the investigation or prosecution of a defendant, does not include the investigation or prosecution for the offenses which occurred in the course of the commission of the murder offense, including the murder offense itself.

(b) The defendant killed the murdered individual intentionally or with the knowledge that the acts which caused the death created a strong probability of death or great bodily harm to the murdered individual or another; and
(c) The other felony was one of the following: robbery, rape, deviate sexual assault, aggravated kidnapping, forcible detention, arson, burglary, or the taking of indecent liberties with a child; or
7. The murdered individual was a witness in a prosecution against the defendant, gave material assistance to the state in any investigation or prosecution of the defendant, or was an eye witness or possessed other material evidence against the defendant.
Ill.Rev.Stat. ch. 38, ¶ 9–1(b).

**52.** *See* 73 Ill.Dec. at 368, 454 N.E.2d at 228. Mr. Williams does not suggest that the murder did not take place "in the course of" a felony.

*Id.* 38 Ill.Dec. at 766–67, 404 N.E.2d at 190–91. Mr. Williams contends that "a defendant charged with the aggravating factor of murder in the course of another felony cannot simultaneously be charged with the additional aggravating factor of murdering a potential witness, if the witness was also the victim of the predicate felonies. Yet that is precisely what happened here." Appellant's Br. at 33.

The district court's conclusion emphasized that the rule in *Brownell* must be read in light of the facts of that case. "The *Brownell* court was faced with a finding by the trial judge that the defendant's murder victim was also an eyewitness to other felonies by mere virtue of the fact that she *could* have testified against him as to the contemporaneous felonies." 742 F.Supp. at 495–96. The *Brownell* court fashioned a rule to prevent a finding that the murder of an eyewitness factor existed in *every* case, "since every victim, obviously, is prevented from testifying against the defendant." 38 Ill.Dec. at 766, 404 N.E.2d at 190.[53] On Mr. Williams' direct appeal, the Illinois Supreme Court distinguished the facts in Mr. Williams' from those in *Brownell:*

> We think that the circumstances here are sufficiently different from those in *Brownell* to permit us to reach a different conclusion. Here, the evidence showed that after kidnapping and raping the victim, the defendant set her free with instructions to go directly home and not to call the police. She did not obey, however, and went to a house for help. The owner of the house told her he would call the police for her and he did so. The defendant was actually secretly watching her, and he took her off and murdered her. The police were on their way to the scene in response to the resident's phone call at the time of the killing.
>
> By his own admission, *the defendant acted as he did because he knew Mrs. Goldstone was going to report the crimes to the police....*
>
> Under these circumstances, the jury could have found both that the murder was committed "in the course" of the other felonies, and that the victim was an eyewitness. There is no significant difference between the circumstances here and a situation in which a defendant kidnaps and rapes the victim, sets her free, and at a later time kills her while she is on her way to testify against him. The latter situation is clearly within this court's understanding of the statute considered in *Brownell.* We do not see why the General Assembly would not have intended the circumstances here to be within the statutory factor.

73 Ill.Dec. at 369, 454 N.E.2d at 229 (emphasis supplied).

As the district court noted, the facts surrounding Mr. Williams' crimes do permit the Illinois Supreme Court's decisions in *Brownell* and *Williams* to be consonant:[54]

---

**53.** The *Brownell* court wrote:

> The court appears to have made the finding that the victim was an eyewitness upon the evidence adduced at trial—that the victim, as the subject of the aggravated kidnapping and rape, could have later testified against the defendant. We do not think this particular factual situation was intended by the General Assembly, to be included within this aggravating factor. Rather, we think the General Assembly intended to include situations where, during an investigation or prosecution of a separate offense which has previously taken place, a witness is killed in an attempt to stymie the investigation or prosecution. (See Remarks of Senator Knuppel, Ill.S.Rec., 80th Gen.Assem., June 1, 1977, at 21–25.) Otherwise, were we to adopt the trial court's finding, this aggravating factor could apply in every prosecution for murder where another offense contemporaneously occurs because the victim could have been a witness against the defendant. Or, even more broadly, this aggravating factor could apply to every prosecution for murder since every victim, obviously, is prevented from testifying against the defendant. We do not think the General Assembly intended the death penalty to be applied in every murder case, and, if it did, the General Assembly could certainly find a more direct way to express its intent than through this aggravating factor.

38 Ill.Dec. at 766–67, 404 N.E.2d at 190–91.

**54.** The district court included several instances from the transcript that indicate that the government presented evidence and argued that Mr. Williams indeed murdered Ms. Goldstone

When there is affirmative evidence that the defendant murdered a victim because the defendant believed the victim was attempting to report another crime, the eyewitness aggravating factor may be found even if at the time the defendant committed the murder the "other felonies" that the victim witnessed were still ongoing as a matter of law.

742 F.Supp. at 496. Illinois law, then, as interpreted by the Illinois Supreme Court, permitted the jury to conclude that Mr. Williams committed both murder in the course of a felony and murder of an eyewitness.

■ A habeas petitioner cannot challenge a state court's construction of state law. "If the state law, as construed by the state's tribunal, provided an unconstitutional result, then the writ should be granted, but not on the ground the state doesn't know its own law." *United States ex rel. Bracey v. Fairman,* 712 F.2d 315, 317 (7th Cir.1983). Therefore, we review a state's determination of aggravating factors only to examine whether they "genuinely narrow the class of persons eligible for the death penalty and ... reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant v. Stephens,* 462 U.S. 862, 877, 103 S.Ct. 2733, 2742, 77 L.Ed.2d 235 (1983); *see also Godfrey v. Georgia,* 446 U.S. 420, 433, 100 S.Ct. 1759, 1767, 64 L.Ed.2d 398 (1980) (must be principled way to distinguish between those cases in which death penalty imposed and those cases it was not); *Furman v. Georgia,* 408 U.S. 238, 313, 92 S.Ct. 2726, 2764, 33 L.Ed.2d 346 (1972) (White, J., concurring) (same). Under the Illinois Supreme Court's construction of state law, there is a principled distinction between those who commit both murder in the course of a felony and murder of an eyewitness and those against whom only the former aggravating circumstance can be made applicable; as we have indicated above, the Illinois Supreme Court has defined reasonably those circumstances justifying a finding that the defendant murdered an eye-

witness. This construction is neither vague nor overbroad, and provides a meaningful way to determine whether the eyewitness factor ought to be considered in a given case.

### Conclusion

After consideration of the briefs, oral argument of counsel, and careful independent review of the record, we conclude that the district court committed no reversible error in denying the petition for a writ of habeas corpus. Accordingly, its decision must be affirmed.

AFFIRMED.

*because he believed she was making an effort to* report the crime. *See* 742 F.Supp. at 496 n. 30.